**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**


**SHEILA FIELDS**                                                              **PLAINTIFF**


**VS.**                            **CASE NO. 4:05CV01924 GTE**


**SHELTER MUTUAL INSURANCE COMPANY**                         **DEFENDANT**


**ORDER**

Presently before the Court is Defendant Shelter Mutual Insurance Company's Motion for

Summary Judgment.

**I.  Background & Facts**

Plaintiff Sheila Fields applied for and was hired by Shelter Mutual Insurance Company

(hereafter "Shelter") into a Claims Adjuster position on July 6, 1999, with a base salary of $2,736

per month.[1]  Plaintiff states that she worked for seven years with State Farm as a senior claims

representative before coming to Shelter.[2]  Ms. Fields' salary was determined under Shelter's

Salary Administration Program, and she never complained that the position into which she was

---

[1]Exhibit 3, EEOC Charge, Defendant's Motion for Summary Judgment (hereafter "Defendant's Motion"); Exhibit 8 at ¶ 4 and Exhibit 8A to Affidavit, Klenke Aff., Defendant's Motion; Plaintiff's Response to Defendant's Statement of Material Facts, ¶ 1.

[2]Exhibit B-1, Fields Application, Plaintiff's Amended and Substituted Brief in Opposition to Defendant's Motion for Summary Judgment (hereafter "Plaintiff's Amended Response").

1

hired or the amount of her initial salary were unfair or discriminatory.[3]  Mr. Klenke, who became

the Branch Manager in the Little Rock, Arkansas, Shelter office on May 1, 2002, states that the

base salary is important because each raise that a Shelter employee receives is calculated by

taking a percentage of the employee's current base salary, translating that percentage into a dollar

amount, and then adding that amount to the employee's current base salary, creating a new base

salary.[4]  However, Plaintiff states that performance reviews, in which a higher rating results in a

larger percentage merit raise, and promotions to supervisor positions, which entitle an employee

of a pay raise of up to 10 percent, also impact an employee's salary.[5]

Ms. Fields' Employee Record demonstrates that she received raises on February 1, 2000,

and February 1, 2001, resulting in new base salaries of $2,872.80 per month and $3,002.08,

respectively.[6]  On August 1, 2001, Ms. Fields was promoted to the position of Senior Claims

Adjustor with a new base salary of $3,302.29.[7]

On June 16, 2002, within two months of Mr. Klenke's arrival at the Little Rock office,

Mr. Klenke promoted Ms. Fields to a classification E-4 Supervisor and acquired a 9.99 percent[8]

raise for her, resulting in a new base salary of $3,632.20 per month.  Upon promotion to an E-4

---

[3]Exhibit 8 at ¶ 3, Klenke Aff., Defendant's Motion; Plaintiff's Response to Defendant's
Statement of Material Facts, ¶ 2.

[4]Exhibit 8 at ¶ 4, Klenke Aff., Defendant's Motion.

[5]Plaintiff's Response to Defendant's Statement of Material Facts, ¶ 3.

[6]Exhibit 8A to Affidavit, Klenke Aff., Defendant's Motion.

[7]Exhibit 8A to Affidavit, Klenke Aff., Defendant's Motion.

[8]While Defendant states that Plaintiff received a 10 percent raise, Plaintiff's correctly note
that she received a pay raise of 9.99 percent.

or E-5 Supervisor position, Shelter's promotional increase policy allows an employee to receive up to a 10 percent raise, which will be calculated using the employee's current base salary, resulting in a new base salary.[9]

In January of 2003, Mr. Klenke gave Ms. Fields a "4," or "meets expectations" rating, on her performance evaluation, resulting in a 2.75 percent merit raise and a new base salary of $3,732.08.[10] In July of 2003, Mr. Klenke promoted Ms. Fields to E-5 Supervisor and acquired for her the maximum 10 percent raise, resulting in a new base salary of $4,105.28 per month.[11] Mr. Klenke states that all subsequent evaluations of Ms. Fields were a "3" rating.[12] She received a raise on July 1, 2004, resulting in a new base salary of $4,248.68.

Mr. Klenke states that at some time after Ms. Fields' promotion, Shelter changed its hiring practice regarding Claims Supervisor positions by allowing for the hire of outside candidates, as opposed to only inside candidates, into these positions.[13] Mr. Klenke asserts that to attract lateral hires and remain competitive in the marketplace, Shelter began offering higher salary amounts than it was previously willing to give.[14]

---

[9]Exhibit 8 at ¶ 5, Klenke Aff., Defendant's Motion; Exhibit W p. V-7, Plaintiff's Amended Response.

[10]Exhibit 8 at ¶ 9 and Exhibit 8A to Affidavit, Klenke Aff., Defendant's Motion.

[11]Exhibit 8 at ¶ 10 and Exhibit 8A to Affidavit, Klenke Aff., Defendant's Motion.

[12]Exhibit 8 at ¶ 14, Klenke Aff., Defendant's Motion

[13]Exhibit 8 at ¶ 16, Klenke Aff., Defendant's Motion

[14]Exhibit 8 at ¶ 16, Klenke Aff., Defendant's Motion

On February 14, 2005, Ms. Fields made a written complaint concerning her evaluation form.[15]  She wrote that she did not believe that she had any availability problems and that she did not agree with the evaluation.[16]  However, she did not inform Mr. Klenke, or anyone else at Shelter, that she believed she was being discriminated against on account of her race.[17]  After this evaluation, on July 1, 2005, Ms. Fields received a 4.5 percent raise, resulting in a base salary of $4,439.87.

Also in 2005, Ms. Fields requested an equity raise because she believed the newly-hired supervisors received higher salaries.[18]  She approached Mr. Charles Allen, an African-American and Director of Compensation for Shelter Human Resources Department, who suggested that she discuss the issue with Mr. Klenke.[19]  Ms. Fields spoke with Mr. Klenke, who reviewed her salary and determined that there was no equity problem.[20]  Mr. Klenke states that during his tenure with Shelter, he knows of no Claims Supervisor in the Little Rock office to ever receive an equity increase and that he has never granted an equity increase to any supervisor.[21]  Matt Moore,

---

[15]Exhibit 2, Fields Dep. p. 22-23, Defendant's Motion; Exhibit 8 at ¶ 15, Klenke Aff., Defendant's Motion.

[16]Exhibit 8 at ¶ 15, Klenke Aff., Defendant's Motion.

[17]Exhibit 8 at ¶ 15, Klenke Aff., Defendant's Motion; Exhibit 4, Fields Dep. p. 300, Defendant's Motion.

[18]Exhibit 8 at ¶ 17, Klenke Aff., Defendant's Motion.

[19]Exhibit 4, Fields Dep. p. 386 Defendant's Motion; Exhibit 8 at ¶ 17, Klenke Aff., Defendant's Motion.

[20]Exhibit 4, Fields Dep. p. 390-91, Defendant's Motion; Exhibit 8 at ¶ 17, Klenke Aff., Defendant's Motion.

[21]Exhibit 8 at ¶ 17, Klenke Aff., Defendant's Motion.

Regional Claims Director, also reviewed her salary and determined that there was no equity problem.[22] She then approached Mr. Ken Nivens, Vice-President of Shelter's Human Resource Department, and asked him to confidentially review her salary as it related to other supervisors with similar background and experience.[23] According to Ms. Fields, Mr. Nivens advised her that Pat Gruber and Matt Moore made a decision that she was not entitled to an equity increase and did not give a basis for that decision.[24]

On February 10, 2005, Ms. Fields filed an EEOC Charge of Discrimination alleging discrimination based upon her race and sex. She alleged that she complained of a wage disparity between other supervisors and herself to upper management, but was told that she would not receive an increase in pay.[25] Plaintiff's right to sue letter is dated September 28, 2005.[26] On October 10, 2005, Plaintiff resigned from Shelter. On December 28, 2005, Plaintiff filed her Complaint in this Court alleging discrimination on account of her race. On December 8, 2006, Ms. Fields filed an Amended Complaint adding a claim under 42 U.S.C. § 1981. As Plaintiff recognizes, "Title VII and § 1981 set forth parallel, substantially identical, legal theories of recovery in cases alleging intentional discrimination in employment on the basis of race." *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997) ("The elements of claims alleging disparate

---

[22]Exhibit 4, Fields Dep. p. 391, Defendant's Motion.

[23]Exhibit 4, Fields Dep. p. 391, Defendant's Motion.

[24]Exhibit 4, Fields Dep. p. 393, Defendant's Motion.

[25]Exhibit 3, EEOC Charge, Defendant's Motion.

[26]Exhibit 6, Right to Sue Letter, Defendant's Motion.

treatment on the basis of race under Title VII and intentional employment discrimination on the basis of race under § 1981 are identical.").

## II. Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,'that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988)) (citations omitted)(brackets in original).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. Rule 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## III. Discussion

In reviewing Plaintiff's discrimination claim, we bear in mind that summary judgment is disfavored in employment discrimination cases, as such cases are "inherently fact-based." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005). Nonetheless, "summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *Id.*

> A plaintiff may survive the defendant's motion for summary judgment in one of two ways. The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link

between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext.

*Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (internal citations omitted)

Because Plaintiff has not submitted "direct evidence" of discrimination, she must produce sufficient circumstantial evidence of illegal discrimination under the *McDonnell Douglas*[27] paradigm. *See Griffith*, 387 F.3d at 736-37.

In an employment discrimination case, the plaintiff must initially present a prima facie case to survive a motion for summary judgment, which raises a rebuttable presumption of discrimination. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134-35 (8th Cir. 1999). The employer must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 1135. If the employer does this, the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual. *Id.*

---

[27]The Eighth Circuit has ruled that while *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed.2d 84 (2003), is relevant in the context of mixed-motive jury instructions, "*Desert Palace* had no impact on prior Eighth Circuit summary judgment decisions," and therefore, the *McDonnell Douglas* framework remains the proper mode of analysis for summary judgment cases. *See Simpson*, 425 F.3d at 542 n.4.

Plaintiff's claim is based on a theory of disparate treatment. "To establish a disparate treatment claim, a plaintiff must show that: (1) he or she is a member of a protected class; (2) he or she was meeting the legitimate expectations as to his her duties; (3) he or she suffered an adverse employment action; and (4) 'circumstances give rise to an inference of discrimination as similarly situated employees, who were not members of the protected group, were treated differently.'" *Gilooly v. Missouri Dept. of Health and Senior Servs.*, 421 F.3d 734, 738-39 (8th Cir. 2005). *See also Wheeler v. Aventis Pharmaceuticals,* 360 F.3d 853, 857 (8th Cir. 2004).

Defendant argues that Plaintiff has failed to establish a prima facie case of discrimination with respect to her merit increases. Defendant also argues that the same actor inference applies in this case, which provides that "[t]here is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time." *Arraleh v. County of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006) (citing *Herr v. Airborne Freight Corp*., 130 F.3d 359, 362 (8th Cir. 1997); *Lowe v. J.B. Hunt Transp*., 963 F.2d 173, 174-75 (8th Cir. 1992) (holding in an age discrimination case that "[i]t is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later.")). Defendant states that while Mr. Klenke was not the person who hired Ms. Fields, he was responsible for promoting her into management of the company, and Ms. Fields claims that he discriminated against her with respect to pay within twelve months of her promotion. Additionally, Defendant argues that the Court is not to "sit as a super-personnel department," "may not second-guess an employer's personnel decisions," and "employers are free to make their own business decisions, even inefficient ones, so long as they do not discriminate

unlawfully." *See Lewis v. St. Cloud State University*, 467 F.3d 1133 (8th Cir. 2006); *Hanebrick v. Brown Shoe Co.*, 110 F.3d 644, 646 (8th Cir. 1997).

Plaintiff states that Shelter utilizes a compensation guide to compensate its employees. The policy of Shelter states that Managers and Supervisors will "[r]ecommend the individual starting salary up to the midpoint of the salary range for filling an open position."[28]  However, the policy also states, "The salary increase for promotion to a senior position cannot exceed 10% of the employee's current monthly salary."[29]  Plaintiff also cites to the compensation policy of Shelter, which states, "Each department is asked to work through the Director of Compensation or the Vice President of Shelter Benefits Management Inc. when an employee is brought into a new position above the starting minimum of the grade.  When a supervisor has a question or concern about compensation issues the supervisor should discuss it with the Director of Compensation."[30]  However, the Court notes that the provision cited by the Plaintiff relates to "promotional increases."[31]

Shelter's Supervisor Salary and Promotion Schedule assumes a salary rate of $3,500 and "meets expectations" merit increases, but notes that individual situations may vary depending on starting salary, performance ratings, and changes in pay ranges.[32]  The Schedule provides for a merit raise after the first six months, promotion to the E-5 Claim Supervisor position after twelve

---

[28]Exhibit W p. V-5, Plaintiff's Amended Response.

[29]Exhibit W p. V-7, Plaintiff's Amended Response.

[30]Exhibit W p. V-7, Plaintiff's Amended Response.

[31]Exhibit W p. V-7, Plaintiff's Amended Response.

[32]Exhibit O-1, Supervisor Salary and Promotion Schedule, Plaintiff's Amended Response.

months, and another merit raise after twenty-four months from the day the employee begins working in the E-4 Claims Supervisor position.[33]

Plaintiff submits Shelter's Salary Schedule effective January 1, 2002, which states the salary scale range for a claims supervisor (E-4) begins at a minimum monthly salary of $3,469.00 and a maximum monthly salary of $5,541.00.[34] Plaintiff states that according to the salary schedule, which was also in effect in 2003, $4,505.00 represents the 100 percent penetration range into the salary schedule. Plaintiff also states that although she was within two weeks of receiving her merit increase, she was only given her promotional increase.[35]

Plaintiff primarily relies upon comparison of her salary with the salaries of the other E-4 Claims Supervisors in the Little Rock claims office: Mary Schinbeckler, Terrell Martin, Hoil Henderson, Steven Wanner, and Teresa Hutchinson, all of whom are white employees of Shelter. She states that her promotion on June 15, 2002, to an E-4 Claims Supervisor position increased her income from $3,302.29 to $3,632.20. Plaintiff also states that her new salary represents a 9.99 percent raise and an 81 percent penetration range on Shelter's 2002 Salary Schedule. Plaintiff states that her July 2003 promotion to E-5 Supervisor increased her salary from $3,732.08 to $4,105.28 per month, which represents the maximum 10 percent raise and a penetration range of 81 percent.[36]

---

[33]Exhibit O-1, Supervisor Salary and Promotion Schedule, Plaintiff's Amended Response.

[34]Exhibit P, Salary Schedule Effective 1/1/02, Plaintiff's Amended Response.

[35]Exhibit A, Plaintiff's Dep. p. 8, Plaintiff's Amended Response.

[36]Exhibit 8 at ¶ 10 and Exhibit 8A to Affidavit, Klenke Aff., Defendant's Motion.

Mary Schinbeckler was hired by Shelter as an E-4 Claims Supervisor in May or June of 2003, with a starting monthly salary of $4,350.00.[37]  Prior to her employment at Shelter, she had been employed by State Farm Insurance since January of 1995, and at the time she moved to Shelter, she was earning $66,000 per year at State Farm.[38]  Plaintiff states that Ms. Schinbeckler's salary represents a 96.5 percent penetration range.  Plaintiff also states that Mr. Schinbeckler's promotion to E-5 Claims Supervisor resulted in a salary of $5,011.57, which represents a penetration range of 97 percent.[39]

Terrell Martin was hired by Shelter on March 12, 1990, in the Little Rock claims office.[40]  On January 1, 2003, Mr. Martin received a merit increase raising his monthly salary from $3,896.42 to $4,058.12.[41]  On February 1, 2003, Mr. Klenke promoted Mr. Martin to the position of E-4 Claims Supervisor increasing his monthly salary from $4058.12 to $4,463.93, a 10 percent increase.[42]  Plaintiff states that Mr. Martin's salary of $4,463.93 represents 99 percent penetration.  Plaintiff also states that Mr. Martin's promotion to E-5 Claims Supervisor resulted in a salary of $5,033.60, which represents a penetration range of 97 percent.[43]

---

[37]Exhibit F, Schinbeckler letter dated 5/28/03, Plaintiff's Amended Response.

[38]Exhibit G & H, Schinbeckler App., Plaintiff's Amended Response.

[39]Exhibit X, Schinbeckler Employee Record, Plaintiff's Amended Response.

[40]Exhibit I, Martin Employee Record, Plaintiff's Amended Response.

[41]Exhibit I, Martin Employee Record, Plaintiff's Amended Response.

[42]Exhibit I, Martin Employee Record, Plaintiff's Amended Response.

[43]Exhibit I, Martin Employee Record, Plaintiff's Amended Response.

Hoil Henderson was hired by Shelter on March 2, 2004, as an E-4 Claims Supervisor with a monthly income of $3,950.00.[44] Mr. Henderson's resume states that he began in the insurance industry on June 25, 1990 at Farmer's Insurance Group, and was a Multi-Line Senior Claims Representative at the time he moved from Farmer's Insurance Group to Shelter.[45] At the time Mr. Henderson was hired by Shelter, the salary range for an E-4 position was $3,538 to $5,652.[46] Plaintiff states that a monthly salary of $4,595.00 represents 100 percent penetration range, and that Mr. Henderson's salary represents a penetration range of 85.9 percent. Plaintiff also states that Mr. Henderson's promotion to E-5 Claims Supervisor resulted in a salary of $4,496.80, which represents a penetration range of 86 percent.[47]

Steven Wanner was hired by Shelter in early May 2003, as a Claims Adjuster in the Little Rock office with a monthly salary of $3,053.00.[48] On December 1, 2003, Mr. Wanner's salary was increased to $3,205.65.[49] Plaintiff states that on June 1, 2004, Mr. Wanner was promoted into the E-4 Claims Supervisor position, with a monthly salary of $3,638.00, which represents a penetration range of 79 percent.[50] At the time Mr. Wanner was promoted, the salary range for an

---

[44]Exhibit J, Henderson letter dated 3/2/04, Plaintiff's Amended Response.

[45]Exhibit J, Henderson Resume, Plaintiff's Amended Response.

[46]Exhibit U, Salary Schedule Effective 1/1/04, Plaintiff's Response.

[47]Exhibit Y, Henderson Employee Record, Plaintiff's Amended Response.

[48]Exhibit M, Wanner Employee Record, Plaintiff's Amended Response.

[49]Exhibit M, Wanner Employee Record, Plaintiff's Amended Response.

[50]Exhibit M, Wanner Employee Record, Plaintiff's Amended Response. The Court notes that the employee record does not clearly indicate that Mr. Wanner was promoted to an E-4 Supervisor position. However, the Court will accept Plaintiff's statements for purposes of

E-4 position was $3,538 to $5,652.[51]  The Court notes that an pay increase of 10 percent would have resulted in a monthly salary of $3,526.22, which would not have met the minimum threshold for an E-4 position.  Plaintiff also states that Mr. Wanner's promotion to E-5 Claims Supervisor resulted in a salary of $4,141.50, which represents a penetration range of 80 percent.[52]

Teresa Hutchinson was employed by Shelter in the Little Rock claims office as a clerk typist on September 19, 1983, at $2.43 per hour.[53]  Ms. Hutchinson was promoted to the position of Senior Claims Adjuster on April 1, 1999, with a monthly salary of $2,779.43.[54]  On January 1, 2003, she was given a merit raise, increasing her monthly salary from $3,534 to $3,680.66.[55]  On February 1, 2003, Ms. Hutchinson was promoted to the E-4 Claims supervisor position, and received a 10 percent raise from $3,680.66 per month to a monthly salary of $4,048.72.[56]  Plaintiff states that this raise represents 89.8 percent penetration range.  Plaintiff also states that Ms. Hutchinson's promotion to E-5 Claims Supervisor resulted in a salary of $4,572.00, which represents a penetration range of 88 percent.[57]

---

summary judgment.

[51]Exhibit U, Salary Schedule Effective 1/1/04, Plaintiff's Amended Response.

[52]Exhibit M, Wanner Employee Record, Plaintiff's Amended Response.

[53]Exhibit N, Hutchinson Employee Record, Plaintiff's Amended Response.

[54]Exhibit N, Hutchinson Employee Record, Plaintiff's Amended Response.

[55]Exhibit N, Hutchinson Employee Record, Plaintiff's Amended Response.  The Court notes that the record states that this increase occurred on January 3, 2002, but the previously listed increases occurred on April 1, 2001, and April 2, 2002, to $3,286.67 and $3,534.00, respectively.  Thus, it appears that the stated date of January 3, 2002, was a clerical error.

[56]Exhibit N, Hutchinson Employee Record, Plaintiff's Amended Response.

[57]Exhibit N, Hutchinson Employee Record, Plaintiff's Amended Response.

Additionally, Plaintiff provides information regarding Mr. Brandon Harris, a white male who was employed by Shelter in its Tulsa, Oklahoma claims office, on March 15, 1999. Plaintiff explains that "Mr. Harris is being cited due to the fact that he was hired in close proximity to the plaintiff, who was hired on July 6, 1999." Mr. Harris began as a Pool Adjuster on March 15, 1999, at a monthly salary of $2,450.00.[58] On January 1, 2003, Mr. Harris received a "Regrade" to the E-4 Supervisor position, raising his salary from $3,274.61 to $3,564.40.[59] Plaintiff states that on March 16, 2003, Mr. Harris was promoted to the E-4 Claims Supervisor position, bringing his monthly salary to $3,920.84, which represents a penetration range of 87 percent.[60] Plaintiff also states that Mr. Harris' promotion to E-5 Claims Supervisor resulted in a salary of $4,442.32, which represents a penetration range of 86 percent.[61]

The Court finds that Plaintiff has not met her burden of establishing a prima facie case of disparate treatment. Plaintiff has failed to establish that she is similarly situated with Mary Schinbeckler, an outside hire who had previously worked at State Farm Insurance, or Hoil Henderson, an outside hire who had previously worked at Farmer's Insurance Group. Additionally, Teresa Hutchinson has been with Shelter for approximately 16 years longer than Plaintiff, and Brandon Harris does not work in the same office as the Plaintiff.

---

[58]Exhibit V, Harris Employee Record, Plaintiff's Amended Response.

[59]Exhibit V, Harris Employee Record, Plaintiff's Amended Response.

[60]Exhibit V, Harris Employee Record, Plaintiff's Amended Response.

[61]Exhibit V, Harris Employee Record, Plaintiff's Amended Response.

Furthermore, while Mr. Wanner, a white male, was not hired until May 1, 2003, four years after the Plaintiff, Plaintiff has failed to account for the fact that Mr. Wanner's penetration range is lower than her penetration range with regard to both the E-4 and E-5 Claims Supervisors promotions. With regard to Shelter's failure to award Plaintiff a merit raise just before her promotion to the E-5 Claims Supervisor position, Plaintiff's own statements indicate that her merit raise was not due for two weeks at the time of her promotion.[62]

Also, as provided for in the Supervisor Salary and Promotion Schedule, Plaintiff received a merit raise after six months in the E-4 Claims Supervisor position, a promotion into an E-5 Claims Supervisor position after twelve months, and a merit raise each twelve months thereafter.[63] Plaintiff's reliance on the denial of her request for an equity raise due her lower salary in comparison to other supervisors is not convincing, as Plaintiff has failed to dispute Mr. Klenke statement that during his tenure with Shelter, he knows of no Claims Supervisor in the Little Rock office to ever receive an equity increase and that he has never granted an equity increase to any supervisor.[64] The allegation that Mr. Klenke promoted Plaintiff with a 10 percent raise, gave her a 2.75 percent merit-based pay raise, then promoted her again with a 10 percent pay raise, within his first fourteen months at the Little Rock Shelter office, but then developed an animus toward Plaintiff based on her race after another twelve months is not convincing. The Court agrees with Defendant's argument that the same actor inference applies in this case.

---

[62]Exhibit A, Plaintiff's Dep. p. 8, Plaintiff's Amended Response.

[63]Exhibit E, Fields Employee Record, Plaintiff's Amended Response.

[64]Exhibit 8 at ¶ 17, Klenke Aff., Defendant's Motion.

Plaintiff also alleges that Mr. Klenke assigned her to undesirable tasks, such as management of the coke and coffee fund, command of the intern program, coverage of the receptionist desk, assignment to subrogation and salvage, and termination of African-American employees.[65] Plaintiff states, "I believe the coke and coffee fund was thought to be beneath the male supervisors."[66] Plaintiff also states that no other employees wanted to work subrogation and salvage or to handle the coke and coffee fund. While we must view the facts in a light most favorable to Plaintiff, "mere allegations which are not supported with specific facts are not enough to withstand [a] motion" for summary judgment. *Klein v. McGowan,* 198 F.3d 705, 709 (8th Cir. 1999). Furthermore, Plaintiff admits that white employees were responsible for at least some, if not all, of these tasks before she was assigned to them. For example, before Plaintiff became responsible for salvage and subrogation, Kevin Martin, a white employee was responsible for those areas.[67] Additionally, a white employee was responsible for watching the front desk and for the coke and coffee fund before Plaintiff became a supervisor.[68]

Also, Plaintiff states that despite the fact that supervisors did not have the authority to terminate employees, she was called in to carry out that assignment. Specifically, she states that

---

[65]The Court questions whether the non-salary related allegations should be considered, as these specific allegations were not raised in the EEOC Complaint. Furthermore, during Plaintiff's deposition, Plaintiff's counsel indicated that the only claim that is a part of the lawsuit goes to the issue of salary discrepancy. See Exhibit 2, Fields Dep. p. 146, Defendant's Motion. However, in an abundance of caution, the Court will consider these allegations.

[66]Exhibit A p. 161, Fields Dep., Plaintiff's Amended Response.

[67]Exhibit A p. 160-61, Fields Dep., Plaintiff's Amended Response. The Court requested pages 160 and 162 of Plaintiff's deposition to put the statements on page 161 in context, and requested that Plaintiff file these pages for the record.

[68]Exhibit A p. 160-61, Fields Dep., Plaintiff's Amended Response.

management decided that Amanda Matlock, an African-American, should be terminated.[69] Plaintiff supervised Ms. Matlock at that time.[70] Plaintiff states that she, as a supervisor, did not have the authority to terminate an employee, but she was asked to tell Ms. Matlock that she was terminated.[71] Plaintiff's argument has no merit. Even if she did not have the authority to terminate an employee, it is clear to the Court that she did not terminate Ms. Matlock. Plaintiff admits that the actual decision was made by Mr. Klenke with the approval of Human Resources, and that she was only asked to convey to Ms. Matlock that she was terminated.[72] Furthermore, she was only asked to sit in on the termination of Fleta Watson, another African-American employee.[73]

Plaintiff further states that white employees were typically afforded longer periods for training, but African-American employees were "baptized by fire." However, Plaintiff offers no proof that white employees were afforded longer training periods. She simply states, "That's the way it appeared to me."[74]

Plaintiff also states that Mr. Klenke disciplined African-American employees for conduct that he did not discipline white employees. Plaintiff states that Fleta Watson, an African-American employee, was disciplined for insubordination, but Steven Wanner and Holly Goodwin

---

[69]Exhibit A p. 175-76, Fields Dep., Plaintiff's Amended Response.

[70]Exhibit A p. 176, Fields Dep., Plaintiff's Amended Response.

[71]Exhibit A p. 176-77, Fields Dep., Plaintiff's Amended Response.

[72]Exhibit A p. 176-77, Fields Dep., Plaintiff's Amended Response.

[73]Exhibit A p. 179, Fields Dep., Plaintiff's Amended Response.

[74]Exhibit A p. 191, Fields Dep., Plaintiff's Amended Response.

were insubordinate to Plaintiff, but were not disciplined. Plaintiff also alleges that Ms. Goodwin falsified documents relative to vehicle mileage, but was not disciplined.

Initially, the Court notes that Plaintiff was not the employee that was disciplined or terminated. With regard to the incident with Mr. Wanner, Plaintiff does not know "if anything ever happened with that" after she brought the incident to Mr. Klenke's attention.[75] Furthermore, Plaintiff has no details regarding the incidents with Ms. Goodwin and Ms. Watson for purposes of comparison. Plaintiff simply states that "[t]he same thing occurred not long before I left the company with Holly Goodwin. Basically, this adjustor, I asked her to do something. She blew up with me about it or whatever."[76] With regard to the mileage, Plaintiff states, "I don't know whatever happened with her regarding this, but obviously, she wasn't terminated."[77] Regarding Ms. Watson, Plaintiff only states that Terry Martin asked Ms. Watson "to do something. I don't recall what it was. All I know is she refused to do it, and she basically was hauled into Tom [Klenke]'s office and read her rights basically."[78] Once again, "mere allegations which are not supported with specific facts are not enough to withstand [a] motion" for summary judgment. *Klein,* 198 F.3d at 709. The Court also notes that Plaintiff admits that she did nothing before the filing of her EEOC charge to let Shelter know that she thought she was being discriminated

---

[75]Exhibit A p. 226, Fields Dep., Plaintiff's Amended Response.

[76]Exhibit A p. 227, Fields Dep., Plaintiff's Amended Response.

[77]Exhibit A p. 265, Fields Dep., Plaintiff's Amended Response.

[78]Exhibit A p. 226-27, Fields Dep., Plaintiff's Amended Response.

against on the basis of her race.[79]  Thus, summary judgment is appropriate as to each of Plaintiff's claims.

Even if the Court assumes that Plaintiff has established a prima facie case, Defendant has articulated a legitimate, non-discriminatory reason for failing to grant Plaintiff's request for a raise.  "Once a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate 'a legitimate, non-discriminatory reason for its adverse employment action.'" *Davis v. KARK-TV, Inc*., 421 F.3d 699, 704 (8th Cir. 2005).  "If the employer meets its burden, 'the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination.'"  *Id*.

Defendant cites Mr. Klenke's affidavit, in which he states that there is no minimum salary that an employee automatically receives upon promotion to a supervisor position, but that Shelter has salary ranges for each position, and as long as the employee's percentage-based raise places them above the minimum salary range for that position, no further action is necessary.[80]  Defendant explains that Plaintiff's initial salary set the course for her future salary amounts, and that she received significant management promotions and salary increases while working for Mr. Klenke.  Defendant states that after review of Plaintiff's salary, it found no equity problem, and Mr. Klenke has never granted an equity raise to any white supervisor during his tenure with Shelter.  It appears to the Court that the progression of the Plaintiff's salary appears to be in

---

[79]Exhibit 2, Fields Dep. p. 28, Defendant's Motion.

[80]Exhibit 8 at ¶ 5, Klenke Aff., Defendant's Motion.

accordance with Defendant's policies, and Plaintiff has failed to prove that the reasons for her salary and denial of an equity increase were pretextual.

Furthermore, with regard to Mr. Henderson and Ms. Schinbeckler, Mr. Klenke states in his affidavit that at some time after Ms. Fields' promotion, Shelter changed its hiring practice to allow for the hire of outside candidates, as opposed to only inside candidates, into supervisor positions.[81]  Mr. Klenke asserts that to attract lateral hires and remain competitive in the marketplace, Shelter began offering higher salary amounts than it was previously willing to give.[82]  Plaintiff has failed to prove that this reason for higher salaries of some white employees is pretextual.  Therefore, summary judgment is appropriate.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Dkt. #24) be, and it is hereby, GRANTED.  Plaintiff's Complaint is dismissed.

IT IS FURTHER ORDERED that Defendant's Motion for Leave to File Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (Docket No. 46) be, and it is hereby, DENIED as moot.

Dated this 19th day of April, 2007.

/s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE

---

[81]Exhibit 8 at ¶ 16, Klenke Aff., Defendant's Motion

[82]Exhibit 8 at ¶ 16, Klenke Aff., Defendant's Motion